## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LOCAL 2322, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL
WORKERS,

               Plaintiff,

v.

VERIZON, INC.,

               Defendant.

Civil Action No. 04-12490 RWZ

### AFFIDAVIT OF STEPHEN J. LOWRIE

I, Stephen J. Lowrie, being first duly sworn, do hereby depose and state as follows:

1.     I am employed by Verizon New England Inc. (the "Company") as a Labor Relations Senior Specialist. I have held that position for 8 years and have been employed by the Company for 26 years, overall.

2.     I was the Labor Relations representative involved in hearing the grievance brought by the International Brotherhood of Electrical Workers, Local 2322 (the "Union") regarding the suspension of Thomas Ouellette.

3.     Mr. Ouellette was initially suspended for three days, December 3, 4 and 5, 2002 for having taken December 2, 2002 off without authorization to attend a funeral.

4.     Mr. Ouellette was not paid for December 2, 2002. This is reflected in the Company attendance record for Mr. Ouellette for the year 2002, a true and correct copy of which is attached hereto at Exhibit C. On this attendance record, December 2, 2002 is marked "A 8:00" which signifies 8 hours of unpaid absence time.

5.     During the grievance process, I agreed to reduce the suspension from three days to one day and paid Mr. Ouellette for two days back pay for December 4 and 5, 2002.

B3018569.1

6.      The Union never brought a grievance regarding the pay treatment of December 2, 2002 for Mr. Ouellette.

7.      I attended the April 30, 2004 arbitration hearing regarding the one-day suspension of Mr. Ouellette (the "Ouellette Arbitration") that was held before Arbitrator Bruce Fraser.

8.      At that time, Arbitrator Fraser was a member of the designated permanent panel of arbitrators to hear the parties' expedited arbitrations brought under Article G9A of the parties' collective bargaining agreement.

9.      Prior to the Ouellette Arbitration, Arbitrator Fraser had arbitrated numerous matters between the parties in both expedited arbitrations and non-expedited arbitrations.

10.      At the Ouellette Arbitration, the issue of the pay treatment of December 2, 2002 was not argued before the Arbitrator. No evidence was presented on the issue of pay treatment for Mr. Ouellette on December 2, 2002.

11.      Following the issuance of the Award by Arbitrator Fraser in the Ouellette Arbitration, the Company abided by that Award and changed the pay coding of December 3, 2003 for Mr. Ouellette from "suspension day" to "unpaid absence," and removed the discipline letter from Mr. Ouellette's file.

12.      Also following the issuance of the Award, I was contacted by the Assistant Business Agent for the Union, Michael Gallagher. Mr. Gallagher stated to me that the Award ordered the Company to pay Mr. Ouellette one day's back pay and he demanded payment. I informed Mr. Gallagher that the Award did not order any back pay and that the Company would not pay.

13.      The Union frequently proposes settling grievances that relate to suspensions by offering to have the Company rescind the suspension, but not pay the grievant back pay.

14.    Recently, the Union made this offer relating to the one-day suspension of Peter Larson. A true and correct copy of my notes of the Larson grievance meeting is attached hereto at Exhibit K. The Union also offered to have the Company reduce the three-day suspension of Phil DaSilva to a letter of warning, but only pay back two days. A true and correct copy of my notes of the DaSilva grievance meeting is attached hereto at Exhibit L.

15.    Occasionally, the Company and the Union settle a grievance by rescinding a suspension, without back pay. Such a settlement was reached in the grievance of the two-day suspension of Manuel Carrico. In that case, the two-day suspension was reduced to a letter of warning, but Mr. Carrico did not receive back pay for that suspension. A true and correct copy of the Carrico settlement agreement is attached hereto at Exhibit M.

16.    I attest that true and correct copies of the following documents are attached hereto at the designated exhibits:

| Exhibit A | Collective Bargaining Agreement between the parties, Provisions G9 and G9A |
| Exhibit B | Opinion and Award in In the Matter of the Arbitration between IBEW, Local 2322 and Verizon, AAA No. 11 E 300 02702 03, (June 4, 2004 Fraser) |
| Exhibit D | December 1, 2003 Union Demand for Arbitration |
| Exhibit E | American Arbitration Association Notice of Hearing in Case No. 11 E 300 02702 03 |
| Exhibit F | Agreement between Verizon New York Inc. and Telesector Resources Group, Inc. and Empire City Subway Company (Limited) and Communication Workers of America AFL-CIO District One, Article 10.03(2) |
| Exhibit G | Opinion and Award in In the Matter of the Arbitration between IBEW, Local 2322 and Verizon, AAA No. 11 E 300 02393 01 (January 24, 2002, Fraser) |

Exhibit H    Opinion and Award in In the Matter of the Arbitration between International Brotherhood of Electrical Workers, Local 2322 and Verizon New England, AAA No. 11 E 300 00368 2 (May 4, 2002, Fraser)

Exhibit I    Opinion and Award in In the Matter of the Arbitration between IBEW, Local 2322 and Bell Atlantic, AAA No. 11 E 300 0799-99 (October 12, 1999, Fraser)

Exhibit J    August 16, 2004 Letter from Arbitrator Bruce Fraser to American Arbitration Association

The above statement is true and correct to the best of my knowledge, information and

belief and is sworn under the pains and penalties of perjury this _15_ of April, 2005.

Stephen J. Lowrie

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail hand on _April 15, 2005_





General

Plant

Traffic

Accounting

Sales

AGREEMENT

between

VERIZON NEW ENGLAND INC.,
TELESECTOR RESOURCES GROUP, INC. and
VERIZON ADVANCED DATA INC.

and

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS
(A.F.L.-C.I.O.)
LOCALS 2222, 2313, 2320, 2321, 2322,
2323, 2324, 2325, 2326, 2327

EFFECTIVE AUGUST 6, 2000



**Agreement between**
**VERIZON NEW ENGLAND INC., TELESECTOR**
**RESOURCES GROUP, INC. and VERIZON ADVANCED**
**DATA INC.**

**AND**

**INTERNATIONAL BROTHERHOOD**
**OF ELECTRICAL WORKERS**
**(A.F.L.- C.I.O.)**
**LOCALS 2222, 2313, 2320, 2321, 2322,**
**2323, 2324, 2325, 2326, 2327**

The following sets forth the understandings reached by the above parties after regional and local negotiations of changes to existing collective bargaining agreements on wages, hours, terms and conditions of employment.

This Agreement will be effective August 6, 2000, unless the provisions provide otherwise; provided, however, that the amendments will be null and void and considered not to have been in effect unless the Company receives from the Union notice of ratification twenty-one days following the signing of this Agreement.

IN WITNESS WHEREOF, the parties to this Agreement after approval by the System Council T-6 hereby agree to be bound by this Agreement and have caused this Agreement to be executed in their names by their duly authorized representatives this 30th day of August, 2000.

**FOR THE COMPANY**

Chairperson, Plant Bargaining Committee            Chairperson, Traffic Bargaining Committee

Chairperson, Accounting Bargaining Committee       Chairperson, Sales Bargaining Committee

**FOR THE UNION**

Chairperson, Plant Negotiating Committee           Chairperson, Traffic Negotiating Committee
Business Manager-Local 2322

Chairperson, Accounting Negotiating Committee       Chairperson, Sales Negotiating Committee
                                                    Business Manager-Local 2327

Business Manager-Local 2222                          Business Manager-Local 2324

Business Manager-Local 2313                          Business Manager-Local 2325

Business Manager-Local 2320                          Business Manager-Local 2326

Business Manager-Local 2321                          Business Manager-Local 2323

Dated: August 20 2000

matter with the individual employee or employees involved without first affording a representative of the Union an opportunity to be present, at a time and place mutually agreeable to the Union and the Company.

**G8.08**    The Company recognizes the right of the Union to make a reasonable investigation of the circumstances surrounding any grievance and agrees to cooperate with the Union in such investigation.

## ARTICLE G9
## Arbitration

**G9.01**    If the Union contends that the intent and meaning of one or more of the Articles of this Agreement (except as otherwise provided in the Agreement) has been violated by the Company, it may demand arbitration provided that written notice is received by the Company no later than sixty (60) calendar days after the conclusion of the final step of the grievance procedure.

**G9.02**    Arbitration shall be conducted through a Board of Arbitration consisting of one (1) representative elected by the Union, one (1) representative selected by the Company, and an impartial chairman mutually chosen by the parties. The procedure for arbitration shall be as follows:

(a)    Each party shall designate a representative to coordinate with the American Arbitration Association on all matters.

(b)    The representatives of the parties shall select the impartial chairman by mutual agreement within fifteen (15) days of Company receipt of demand for arbitration involving a discharge, and within fifteen (15) days of the union's request to schedule for hearing any other arbitration demand. If the representatives of the parties are unable to agree on the impartial chairman within the fifteen (15) days, either party can request the American Arbitration Association to expeditiously submit a series of three lists from which an arbitrator will be chosen by the parties in accordance with their three list procedure.

(c)    If the Company contends at the hearing that the grievance desired to be arbitrated does not raise an arbitrable issue, the Board of Arbitration shall first hear and determine separately in accordance with paragraph (e) below, the question of

**G12**



whether an arbitrable issue has been presented. If the Board decides that the issue or issues are arbitrable it shall have authority to further hear and determine the merits of the grievance.

(d) Hearings and post-hearing activities shall be conducted in accordance with the Voluntary Labor Arbitration Rules of the American Arbitration Association. If either party wishes to submit a post-hearing brief, it will do so within thirty (30) days of receipt of transcript of the hearing, unless the parties agree otherwise.

(e) The decision of a majority of the Board shall be the decision of the Board of Arbitration. The Board shall have no power to add to, subtract from, modify or disregard any of the provisions of this Agreement nor shall it have power to establish or determine any new wage rate, job classification or job differential. The decision of the Board, which shall contain a full statement of the grounds upon which the issue or issues are decided, shall be final and binding on the Union and the Company.

(f) Each party shall bear the expense of preparing and presenting its own case. The compensation and expenses of the impartial chairman and any other expenses of such Board shall be borne equally by the parties.

G9.03  (a) If the grievance involves a discharge or disciplinary action, the Board of Arbitration shall determine whether the discharge or disciplinary action was for just cause. If the Board of Arbitration finds that the discharge or disciplinary action was without just cause, the employee shall be reinstated. At the Board's discretion the employee may be granted lost seniority, the employee's basic weekly wage rate for straight time lost, and an additional amount not to exceed ten (10) percent of the former, such amount to be in lieu of all other losses which the employee may have incurred during the time the employee was separated from the Company. No other benefits, lost overtime opportunities, or other amounts shall be paid. The Board's total back pay award, as calculated above shall be reduced by: all interim earned income, including overtime earnings; unemployment compensation; termination pay; and

**G13**

Company pension payments. The Board shall have the discretion to deduct other amounts deemed appropriate, such as Social Security Disability payments etc.

(b) If such grievance concerns any other determination of the Company involving the exercise of discretion, such determination shall not be set aside by the Board of Arbitration unless it shall find it to have been made arbitrarily or in bad faith.

**G9.04**   Any question in connection with the discipline, demotion or dismissal of any regular employee having less than one (1) year of net credited service, or any temporary employee having less than two (2) years of net credited service, at the time of such discipline, demotion or dismissal is specifically excluded from the arbitration procedures outlined in this Article.

**G9.05**   Any arbitration case which has not been scheduled for hearing by the parties within twenty-four (24) months of the date of initial receipt by the Company of the demand for arbitration, or thirty-six (36) months if the case involves a discharge, will be considered to have been finally disposed of under the provisions of Article G8, unless the Company and the Union mutually agree in writing to extend the time period.

## ARTICLE G9A
## Expedited Arbitration

**G9A.01**   The procedures herein will apply to arbitration involving disciplinary action which is specifically subject to arbitration under the collective bargaining agreement.

**G9A.02**   In lieu of the procedures specified in Article G9 of this Agreement, any grievance involving the suspension of an individual employee, except those which also involve an issue of arbitrability, contract interpretation, or work stoppage (strike) activity and those which are also the subject of an administrative charge or court action shall be submitted to arbitration under the expedited arbitration procedure hereinafter provided within fifteen (15) calendar days after the filing of a request for arbitration. In all other grievances involving disciplinary action which are specifically subject to arbitration under Article G9 of this Agreement, both parties may, within fifteen (15) calendar days after the filing of the request for arbitration, elect to use the expedited arbitration procedure hereinafter provided. The election shall be in

G14



writing and, when signed by authorized representatives of the parties, shall be irrevocable. If no such election is made within the foregoing time period, the arbitration procedure in Article G9 shall be followed.

**G9A.03** As soon as possible after this Agreement becomes final and binding, a panel of 5 umpires shall be selected by the parties. Each umpire shall serve until the termination of this Agreement unless his or her services are terminated earlier by written notice from either party to the other. The umpire shall be notified of his or her termination by joint letter from the parties. The umpire shall conclude his or her services by settling any grievance previously heard. A successor umpire shall be selected by the parties. Umpires shall be assigned cases in rotating order designated by the parties. If an umpire is not available for a hearing within ten (10) working days after receiving an assignment, the case will be passed to the next umpire. If no one can hear the case within ten (10) working days, the case will be assigned to the umpire who can hear the case on the earliest date.

**G9A.04** The procedure for expedited arbitration shall be as follows:

(a) The parties shall notify the umpire in writing on the day of agreement or date of arbitration demands in suspension cases to settle a grievance by expedited arbitration. The umpire shall notify the parties in writing of the hearing date.

(b) The parties may submit to the umpire prior to the hearing a written stipulation of all facts not in dispute.

(c) The hearing shall be informal without formal rules of evidence and without a transcript. However, the umpire shall be satisfied himself or herself that the evidence submitted is of a type on which he or she can rely, that the hearing is in all respects a fair one, and that all facts necessary to a fair settlement and reasonably obtainable are brought before the umpire.

(d) Within five (5) working days after the hearing, each party may submit a brief written summary of the issues raised at the hearing and arguments supporting its position. The umpire shall give his or her settlement within five (5) working days after receiving the briefs. He or she shall provide the parties a brief written statement of the reasons supporting his or her settlement.

**G15**

(e) The umpire's settlement shall apply only to the instant grievance, which shall be settled thereby. It shall not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the parties unless the settlement or a modification thereof is adopted by the written concurrence of the representatives of each party at the third step of the grievance procedure.

(f) The time limits in (a) and (d) of this Section may be extended by agreement of the parties or at the umpire's request, in either case only in emergency situations. Such extensions shall not circumvent the purpose of this procedure.

(g) In any grievance arbitrated under the provisions of this Section, the Company shall under no circumstances be liable for backpay for more than six (6) months (plus any time that the processing of the grievance or arbitration was delayed at the specific request of the Company) after the date of the disciplinary action. Delays requested by the Union in which the Company concurs shall not be included in such additional time.

(h) The umpire shall have no authority to add to, subtract from or modify any provisions of this Agreement.

(i) The decision of the umpire will settle the grievance, and the Company and the Union agree to abide by such decision. The compensation and expenses of the umpire and the general expenses of the arbitration shall be borne by the Company and the Union in equal parts. Each party shall bear the expense of its representatives and witnesses.

(j) The time limit for requesting arbitration under this provision shall be the same as in existing procedures.

## Article G9B
## Mediation

### MEDIATION PROCEDURES

**G9B.01**  For grievances involving discharges or disciplinary suspensions which are specifically subject to arbitration under Article G9 of this

G16



JUN 0 9 2004

In the Matter of the Arbitration between:

```
IBEW, LOCAL 2322

        -and-

VERIZON
```

Re: 11 E 300 02702 03 (Thomas Ouellette Suspension and Letter in Personnel Folder)

Having been designated as the Arbitrator in accordance with the provisions of the parties' collective bargaining agreement, and having heard and considered the evidence presented, I award as follows:

   The one day suspension given to Thomas Ouellette was not for just cause.
   The day shall be converted to leave without pay and the discipline removed from
   his file.

June 4, 2004
Scituate, Massachusetts

Bruce Fraser
Arbitrator

| IBEW, Local 2322 | AAA. No. 11 E 300 02702 03 |
| -and- | Thomas Ouellette Suspension |
| Verizon | June 4, 2004 |

An arbitration hearing was held on April 30, 2004 in Boston, Massachusetts. The Union was represented by Harold Lichten, Esq., and the Company was represented by Alicia Alonso Matos, Esq. Post-hearing briefs were received by the arbitrator on May 16. 2004.

**THE ISSUE**

The parties agreed upon the following issue:

Was the one-day suspension given to Thomas Ouellette for just cause?

If not, what shall be the remedy

**THE FACTS**

In November, 2002, Thomas Ouellette, the grievant, worked in the Taunton facility as a Central Office Technician. On Friday, November 29, his wife's grandfather died. His wife, who had formerly worked for Verizon, contacted a current employee about the time-off her husband would be permitted under the Agreement for bereavement, and was told it was three days. Operating on this information, when Ouellette found out on Sunday evening that the service would be held the next day, he called his immediate supervisor, Terry Brown, and left a message on his voice mail to the effect that he would be absent on Monday through Wednesday and if there were any problems with this, to please call him back. There was some dispute over what the voice mail message actually said, but I don't find it relevant.

When Brown reached work at 8 am on Monday morning and checked his voice mail, he contacted his supervisor Manager of New England Transport Surveillance Center Barry Sullivan

who informed him that Ouellette was not entitled to the days off but they could work something out for the funeral. He immediately called Ouellette and informed him of this fact, reading to him the relevant provision in the contract, P10.03.

> P10.03  An employee may be granted time off with pay, for excused absence because of death in the immediate family normally not to exceed three working days. The Company's decision in each case must be based upon circumstances in such case.
>
> The "immediate" family shall be considered to mean husband, wife, domestic partner, son, daughter, mother, father, brother, sister, mother-in-law, father-in-law, grandparent and grandchild; also, any other relative living in the employee's household.

Brown testified that he volunteered "I could try to work out time to go to the funeral" but stated that Ouellette never said he wanted the entire day off or told him at that time when the funeral service would take place. He stated that he told Ouellette that he expected him at work that day. Ouellette said he would call him back.

According to Brown, Ouellette called back about 10:30 am and informed him that the funeral was that day, that he couldn't come in, and that he would be back the next day, Tuesday. Brown stated that he once again told Ouellette that he was expected in that day. This comment was overheard by Team Leader Teresa Pontbriand who was nearby. Brown stated that he is not authorized by his supervisor's policy to give more than 4 hours of time off and would have had to contact Barry Sullivan, his supervisor, to receive authorization for the entire day. Brown never asked for such authorization, but went to Sullivan again, stated that the grievant refused to report to work, and did not inform him that the funeral was that day.

When the grievant reported for work on Tuesday, December 3, 2002, he was suspended for three days for an unauthorized absence. Brown indicated that Ouellette expressed surprise at this

3

decision, stating that Ouellette believed he had been given Approved Absence (AP) time for the day of the funeral.

The Union grieved, the suspension was reduced to one day, but when the dispute could not be resolved, the Union filed for arbitration.

Sullivan testified that he had two conversation with Brown. In the first, he was informed that Ouellette was not coming to work and felt he was entitled contractually to three days, whereupon he told Brown to call the grievant, tell him that this was not the case, but that they could work something out so that he could attend the funeral. In the second, Brown told him Ouellette was not coming to work but was not told by Brown that the funeral was in a few hours. Based on this information, he called Labor Relations and was told that a short suspension was warranted, but that he should use his own discretion. He said that if he had known the funeral was that day, he would have considered giving him the time off.

The grievant testified that he first learned on Sunday evening that the funeral service for his wife's grandfather would be held on Monday at 6 pm. He stated that he called Brown, and after hearing a message that stated, "You have reached Terry Brown. Please leave a message," he left a message indicating that he thought he had 3 days off contractually, and if there were any problems, he could be reached at home. He testified at the hearing that his wife needed him, since she was preparing food for after the service, was preparing a eulogy to be given at the service, and could not watch their 3 month old son.

Ouellette testified that when Brown called him the next morning, he told him that he was not entitled to three days contractually, but he could grant me one day for the funeral service. Ouel-lette said he would call back Brown, consulted with the Union, found out that Brown was cor-

4

rect, and called Brown about 10:30 stating that the funeral was that day, that he would take the one day he had been given, and said he would see him the next day. According to Ouellette, Brown acknowledged that they would meet the next day and never stated he could not have the day off. He agreed that he expressed surprise the next day when he was suspended for three days after having been given a day off.

The Union provided testimony of several employees who had received AP time for the death of a spouse's or finance's grandparent, a benefit not covered by the contract. One such granting was given after the fact. There was no evidence, other than the case at hand, of cases where time off was denied even though it is not contractually mandated.

## DISCUSSION

The evidence shows that Verizon has been very reasonable in permitting company personnel time off for bereavement purposes when the funeral was for someone not specifically covered by Section P10.03. But for the poor communication of the two principal players in the grievance – Ouelette and Brown – there is every reason to believe Ouellette would have been given the day off on Monday, December 2, 2002.

For his part, Ouellette failed to read his contract to see what rights he had under P10.03. Had he done this, he could have reached management personnel on that Sunday evening to secure the necessary time off after he did not reach Brown directly. In addition, he failed to notify Brown during his first phone call at 8 am that the funeral was on that day, thereby alerting him to the need for time off on that day. Moreover, there is no evidence that he ever conveyed to Brown that he had family responsibilities during the day that he felt obligated to fulfill. Finally, there is

5

no evidence that he specifically asked for the day off, but just assumed he was given it, although the testimony from both parties is murky, at best.

For his part, Brown failed to inquire of Ouellette's needs surrounding the funeral. Had he simply asked, he could have found the difficulty Ouelette found himself facing: a conflict between reporting for work and fulfilling obligations at home. Given he had a limit of authorizing but 4 hours time off, he might have suggested that Ouellette take the rest of the day off and make up the time on another day. Or, once he realized that the funeral was that day, he could have notified his supervisor of this fact and asked permission to given Ouellette the entire day off. Sullivan's testimony indicated he would have been sympathetic. Instead, Brown simply reported that Ouellette was not going report for work that day.

Both principal player were at fault here and discipline is not warranted. Rather, the day should be converted to leave without pay and the discipline removed from the grievant's file.

**AWARD**

The one day suspension given to Thomas Ouellette was not for just cause.
The day shall be converted to leave without pay and the discipline removed from his file.

June 4, 2004
Scituate, MA

Bruce Fraser
Arbitrator



VERIZO.  —mployee Absence/Tardiness Record

**C O P Y  C I L**  verizon

| NAME | Social Security No. | Title | | Year 2002 | WORK LOCATION- | Net Credited Service Date |
|---|---|---|---|---|---|---|
| OUELLETTE, THOMAS | 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 | CENTRAL OFFICE TECH | | | 385 MYLES STANDISH BLVD. TAUNTON | 11/25/1996 |
| Residence - Street No. / Name | | City | | State | Zip Code | Telephone No. |
| 1020 SOMERSET AVE UNIT 13 | | N. DIGHTON | | MA | 02764 | 508-669-5143 |

Current Year Vacation

Previous Year – Days Carried Over

Carried Over To Next Year

ouellette

*NOT FMLA APPROVED

# VERIZON EMPLOYEE ABSENCE/TARDINESS RECORD
(REVERSE SIDE)

| Date Abs/Tardy | Day of Occur | Reason for Absence or Tardiness | Investigation, Interview Details and Action Taken | Contact | Name, Title and Date |
|---|---|---|---|---|---|
| 3-18 19/6 | F,M,T,W,Th | | | | |
| | | | Reviewed | WSD | Warren Wells 02-07-02 |
| | | | Reviewed W/Raj Conte about information against | WSD | Warren Wells 3-5-02 |
| | | | information on 1477. | | |
| | | | Reviewed 1477 for accuracy | WSD | Warren Wells 3-19-02 |
| 5/8/02 | W | AP-400 | FAMILY EMERGENCY | | Reviewed W/Warren Wells 3/19/02 |
| 6/21-6/27 | F-Th | S-8.00 | Out Sick - FMLA APPROVED | | |
| 8/7-8/6 | W-F | AC-8.00 | CARE OF NEWBORN LEAVE | | |
| 9/9-9/20 | M-F | | CARE OF NEWBORN - DROPPED FROM PAYROLL | | |
| 9/23/02 | M | | RETURN TO WORK | | |
| 9/24 9/9 | T-M | DS-800 | Out Sick | | |
| 10-1-10/8 | T-F | IRE-800 (CONTINUATION) OF 9/24 ABSENCE - FMLA APPROVED | | | |
| 10/9-10/8 | T-F | IBF-8.00 OUT SICK - REL ABSE (WITHIN 14 DAYS) - FMLA APPROVED | | | |
| 11/19-11/8 | F-F | IBS-8.00 OUT SICK - FMLA DENIED | | | |
| 11/11 | F | IB-800 CONTINUATION OF 9/24 ABSENCE - FMLA EXHAUSTED | | | |

H Tardy    V Vacation    X Personal Time of EWD / MPD    H Holiday (Designated)    F Holiday (Floating)    R Restricted Duty

CONTINUE ON G-550-A / 1477A

| Paid | Incidental Absence | Disability & Other Absence |
|---|---|---|
| DS = Dept. Sickness (1-7 Days) | Not Paid | ACN = "ACP" Over 52 Weeks |
| DST Dept. Sickness Off Duty Accident | AA = Half Day Due To Illness, Off Duty | ACR = Accident Benefits-Relapse |
| APA = Half Day Due To On The Job Accident | Accident & Other | APB = Other Absence Paid |
| 0 = FMLA | I = Illness, Off Duty Accident (1 - 7 Days) | |

**Paid**
APS = Half Day Due To Illness
APD = Half Day Due To Off Duty Accident

**Not Paid**
FA = Authorized Leave of Absence For Care of Family (1-7 Days)

IB = Illness Benefits
IBA = Illness Benefits Off Duty Accident
IBP = "IB" Beyond 6 Months

IBE = "IBA" Beyond Months
AC = Accident Benefits
ACP = "AC" Beyond 6 Months thru 52 Weeks

AB = Other Absence Not Paid
FB = Other Authorized Absence

2002



# ABSENCE and TARDINESS RECORD - INTERVIEW DETAILS

verizon

Name: OUELLETTE, THOMAS 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 Year: 2002

| Date Abs/Tardy | Day of Occur | Reason for Absence or Tardiness | Investigation, Interview Details and Action Taken | Contact | Name, Title and Date |
|---|---|---|---|---|---|
| 12/2 | M | A-8:00 | UNAUTHORIZED ABSENCE | | |
| 12/3 | T | SI-8:00 | SUSPENDED | | |
| 1/13/03 | Tu | | Reviewed MTT with Tom O. | Jerome J. Brown III (T.C.) | |
| 1/23/03 | Th | | On 11/25/02 Mr. Ouellette was administered a verbal warning based on absence of 11/1/2002 and 11/19/2002 "See Contact memo of 11/25/2002." | Jerome J. Brown III (T.C.) | |
| 1/23/03 | | | Noted [signature] | | Manager |

COPY

G550A/1477A (9/94) FCC Item 228 (Rev. Opt.)

# American Arbitration Association

## LABOR ARBITRATION RULES

To institute proceedings, please send three copies of this demand *and the arbitration agreement*, with the filing fee as provided in the rules, to the AAA. Send the original demand to the respondent.

### DEMAND FOR ARBITRATION

DATE: __12-1-03__

TO: Name of the Union ☐  Employer ☒ ___VERIZON___

(of the Party on Whom the Demand Is Made)

Address __185 FRANKLIN STREET__

City and State __BOSTON, MA_____ ZIP Code __02110-1585__

Telephone ( 617 ) __743-2166_____ Fax __617-345-9829__

Name of Representative __JOHN MAY, ESQ.__

(if Known)

Representative's Address __185 FRANKLIN STREET, ROOM 1408__

Name of Firm (if Applicable) __VERIZON__

City and State __BOSTON, MA_____ ZIP Code __02110-1585__

Telephone (617 ) __743-2166_____ Fax _____

The named claimant, a party to an arbitration agreement contained in a written contract dated __8/06/00__
_____ and providing for arbitration under the Labor Arbitration Rules of the American Arbitration Association, hereby demands arbitration thereunder.

THE NAME OF THE GRIEVANT: __IBEW - LOCAL 2322__     GRIEVANCE # __21-03__

THE NATURE OF THE DISPUTE:

    **ONE DAY SUSPENSION & LETTER IN PERSONNEL FOLDER.**
       **THOMAS OUELLETTE**

ARTICLES: G1 THRU G35, P1 THRU P20, ALL MEMOS OF COMMITMENT, MEMOS OF AGREEMENT, EXHIBITS, LETTERS OF AGREEMENT & OTHERS

THE CLAIM OR RELIEF SOUGHT (the Amount, if Any):

    **CEASE AND DESIST, RESCIND SUSPENSION & MAKE EMPLOYEE WHOLE.**

**LOCAL 2322 HEREBY REQUESTS TO USE EXPEDITED ARBITRATION AS PER ARTICLE G9A OF THE LABOR AGREEMENT.**

HEARING LOCALE REQUESTED: _____**BOSTON, MA**_____

(City and State)

You are hereby notified that copies of our arbitration agreement and of this demand are being filed with the American Arbitration Association at its ___**BOSTON, MA**___ office with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement after notice from the administrator.

Signed __*Myles Calvey*_____ Title __CHAIRMAN T-6__

(May Be Signed by a Representative)

Name of the Claiming Union or Employer __LOCAL 2322 IBEW AND ALL OTHER LOCALS OF THE SYSTEM__

Address (to Be Used in Connection with This Case) __122 QUINCY SHORE DRIVE__     COUNCIL T-6 IBEW

City and State __NO. QUINCY, MA._____ ZIP Code __02171-2996__

Telephone ( 617 ) __328-9600_____ Fax __617-328-8094__

Name of Representative _____

Name of Firm (if Applicable) __PYLE, ROME, LICHTEN & EHRENBERG, P.C.__

Representative's Address __18 TREMONT STREET, 5TH FLOOR__

City and State __BOSTON, MA_____ ZIP Code __02108__

Telephone ( 617 ) __367-7200_____ Fax __(617) 367-4820__

MEDIATION is a nonbinding process. The mediator assists the parties in working out a solution that is acceptable to them. If you

E



# AMERICAN ARBITRATION ASSOCIATION
## Notice of Hearing

AR003 - 015117

March 31, 2004

Harold L. Lichten, Esq.
Pyle, Rome, Lichten & Ehrenberg P.C.
18 Tremont Street
Suite 500
Boston, MA 02103

John S. May, Esq.
Verizon
185 Franklin Street
Boston, MA 02110

Re: 11 E 300 02702 03
    IBEW, Local 2322
    and
    Verizon

Grievances:    #21-03 Thomas Ouellette - One Day Suspension & Letter in Personnel Folder

PLEASE TAKE NOTICE that a hearing in the above-entitled arbitration will be held as follows:

    Place:    American Arbitration Association
                 133 Federal Street
                 11th Floor
                 Boston, MA 02110

    Date:    April 30, 2004

    Time:    1:00 PM

    Before:  Bruce Fraser

    Note:    **\* Rescheduled from April 8, 2004 \***

Please attend promptly with your witnesses and be prepared to present your proofs.

                 Claire M. Connelly
                 Assistant Supervisor
                 617 695 6014
                 connellyc@adr.org

NOTICE: The arbitrator(s) have arranged their schedule and reserved the above date(s) based on the advice of the parties. Therefore, every effort should be made to appear on the date(s) scheduled. In the event that unforeseen circumstances make it impossible to attend the hearing as scheduled, a party requesting a postponement should obtain the agreement of the other party. If there is no mutual agreement, the arbitrator(s) will make a determination. All requests for postponements must be communicated to the Case Manager not the arbitrator). There should be no communication between the parties and the neutral arbitrator(s) other than at oral hearings. In some instances, postponements are subject to cancellation fees by the arbitrator(s). Any party wishing a stenographic record must make arrangements directly with the stenographer and notify the other parties in advance of the hearings.

cc:    Bruce Fraser
       Richard R. Cappiello
       Stephen J. Lowrie

F





AGREEMENT

between

VERIZON NEW YORK INC.

AND

TELESECTOR RESOURCES GROUP, INC

AND

EMPIRE CITY SUBWAY COMPANY (LIMITED)

AND

COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO DISTRICT ONE

EFFECTIVE AUGUST 6, 2000

verizon

basic weekly wages shall be raised to the applicable rate.

(2) If the demoted employee's basic weekly wage rate at the time of his demotion is above the wage rate for the appropriate step under the new table, the demoted employee shall receive no wage increase until such time as his net credited service or assumed length of service entitles him to progress to the next step of the table for the lower classification.

(3) In no event shall an employee so demoted receive a wage increase that would cause his basic weekly wage rate to exceed the maximum rate for the occupational classification to which he has demoted.

For the purposes of this Section continuous service in an occupational classification shall include service in occupational classifications with the same top basic weekly wage rate as the occupational classification from which demoted.

## REINSTATEMENT

**10.03**    If it is determined in the grievance procedure by both the Company and the Union that the employee shall be reinstated, the Company agrees to reinstate the employee and reimburse him as follows:

(1) In a discharge case, the employee shall receive his basic weekly wage rate for the time lost (including pay lost during the ten (10) day suspension period) less the amount of any termination pay received from the Company, and unemployment compensation received or receivable, and any amount paid to or receivable by the employee as wages in other employment. If the employee received a termination payment and the number of weeks since the date of discharge is less than the number of weeks upon which the payment was based, less vacation, if any, the amount paid to the employee for the excess number of weeks shall be considered as an advance to him by the Company. Repayment shall be made by the employee on a weekly basis satisfactory to the Company until the amount is fully paid, but the employee shall not be required to repay each week at a rate in excess of 10% of his basic weekly wage rate.

26

The employee shall also receive:

(a) reimbursement for premiums paid by him from the date of discharge for insurance coverage that does not exceed coverage provided under the Company's Medical Expense Plan, Group Life and Accidental Death or Dismemberment Insurance Program, Vision Care Plan and Dental Expense Plan.

(b) insurance coverage retroactive to the date of discharge for uninsured expenses actually incurred that would have been covered under the Company's Medical Expense Plan, Vision Care Plan and Dental Expense Plan and

(c) reimbursement for the amount of discounted telephone service lost during the period of discharge.

(2) In a suspension case, the employee shall receive his basic weekly wage rate for the time lost less the amount of any unemployment compensation received or receivable and any amount paid to or receivable by the employee as wages in other employment.

(3) In a demotion case, the employee shall be made whole for the difference in basic weekly wage rates for period of demotion, including any applicable differentials.

## POWER OR JURISDICTION OF ARBITRATORS

**10.04**    No Arbitrator shall have power or jurisdiction to modify the Company's action.    The Arbitrator shall either find that the Company's action was not without just cause, in which event the suspension, demotion or discharge shall be sustained in full; or that the suspension, demotion or discharge was without just cause, in which event the treatment of the case shall be as set forth in Section 10.03 of this Article.

## UNION REPRESENTATION

**10.05**    At any meeting between a representative of the Company and an employee in which discipline (including warnings which are to be recorded in the personnel file, suspension, demotion or discharge for cause) is to be announced, a Union representative may be present if the employee so requests.

**27**

G

RECYCLED

In the Matter of the Arbitration between:

| |
|---|
| IBEW, Local 2322 |
| -and- |
| VERIZON |

Re: Case No. AAA 11 E 300 02393 01

Having been designated as the Arbitrator in accordance with the provisions of the parties' collective bargaining agreement, and having heard and considered the evidence presented, I award as follows:

> The suspension given to Daniel Roy was not for just cause. He shall be given a letter of warning and be made whole for the day of suspension.

January 24, 2002
Scituate, Massachusetts

Bruce Fraser
Arbitrator

| IBEW, LOCAL 2322 | Arbitration Decision & Award |
|---|---|
| -and- | AAA 11 E 300 02393 01 |
| Verizon | December 27, 2001 |

A hearing was held on December 14, 2001 in Boston, Massachusetts. The Union was represented by Betsy Ehrenberg, Esq., and the Company was represented by Daniel Blake, Esq. Post-hearing briefs were received by the arbitrator on December 22, 2001.

**THE ISSUE**

At the hearing the parties agreed upon the following issue:

Was there just cause to suspend the grievant for one day:

If not, what shall the remedy be?

**THE FACTS**

The grievant, Daniel Roy, is employed as an Outside Plant Technician at the Taunton, MA facility. On January 14, 2001 he was assigned to install two poles with Richard Thomas as his partner.

In preparation for going to the work location, Roy testified that with Thomas guiding him, he backed the corner mount vehicle to a position where the pole trailer could be attached. The two then loaded the two poles on the trailer, and Roy drove out of the yard with Thomas in another truck. He testified that he assumed that Thomas had secured the trailer to the truck, secured the safety chains and electrical connection, but he did not check to make sure that this was done.

Shortly after leaving the yard, the trailer became unhitched from the truck and ended up off the road. No injury or damage to property occurred. When Manager Jean Galanis happened on the scene, Roy along with Thomas and another employee were attempting to hook up the trailer

to the vehicle. Galanis testified that Roy, on being asked what happened, said words to the effect, "The trailer was not secured." The employee were told to bring the trucks and the trailer back to the garage whereupon Roy was suspended, pending investigation. There was no evidence of an investigation and the decision was subsequently made to suspend Roy for one day. His partner, Thomas, received no discipline.

In making this decision, Galanis testified that she took into account the fact that he had a verbal warning for failing to follow the safety policy in April 1999 and a verbal warning for violating Company motor vehicle policy in August 1999 when he left the keys in the ignition while the vehicle was unattended. She also stated that she considered as well various complaints from fellow employee about Roy's safety behavior. No documentary evidence was provided on the alleged employee complaints or evidence of discipline associated with it.

## CONTENTIONS OF THE COMPANY

The Company contends that there was just cause to suspend Roy for one day when he failed make certain that the trailer carrying two telephone poles was secured to his truck before driving off from the yard. It argues that as the driver of the Corner Mount vehicle, it was his responsibility to ascertain that the pole trailer was properly connected. There is no question that it was not, and, as a result, the trailer became free and ran off the road. It continues, that the level of discipline--a one day suspension--was appropriate, given the severity of the safety infraction, and his record of two verbal warning over safety issues. In addition, the Union presented no mitigating circumstances: Roy simply assumed but did not ask Thomas if he had secured the trailer. In fact, the Company asserts that the Union never alleged throughout the grievance procedure that it was Thomas who actually had not secured the trailer.

3

Finally, the Company rejects the Union's contention of disparate treatment, noting that the one incident relied on involved an employee who attempted to connect the trailer and failed. It also rejects the grievances presented by the Union involving automobile accidents, which typically require instantaneous judgement, as contrasted with the present case in which Roy was under no time pressure and was simply negligent in checking the trailer hook-up.

## CONTENTIONS OF THE UNION

The Union contends that there was not just cause to suspend Daniel Roy for one day. First, the Company did not investigate the accident, for example, to learn that it was Thomas, not Roy, who had neglected to secure the trailer or to learn if the hitch was defective. Second, although the consequences of the accident were potentially serious, neither personal injury or property damage resulted. This is especially relevant, the Union stresses, in light of Roy's concern of the potential damage that might have ensued which, it argues, makes discipline less necessary.

Third, the Union asserted that the Company abandoned progressive discipline by suspending Roy rather than imposing a written warning with the prior discipline consisting of only two verbal warnings. Written warnings routinely precede a suspension, absent some exceptional circumstances, which were not present here. Fourth, the Union claims that the discipline imposed is inconsistent with that given to a number of other employees, employees who have had far more serious accidents than that of the grievant, and employees who have had more than one accident with a short time period.

## DISCUSSION

Despite what the Union alleges was an insufficient investigation, the grievant acknowledged at the time of the accident that the trailer was not secured and acknowledged at the hearing that

4

he did not check the hook-up but only assumed it was secure. Given he was the driver of the truck that pulled the trailer, it was his responsibility to ascertain that the hook-up had been properly completed. He did not, merely assumed it had been, and thus failed to fulfill a safety procedure. Discipline is warranted.

Leaving aside the Union's argument of alleged disparate treatment and the argument concerning the lack of damage or injury sustained as a result of the accident, the discipline imposed in this case was a suspension, in spite of the fact that Roy had had only two verbal warnings on his record. Progressive discipline typically moves to ever-increasing penalties for each infraction, unless the violation is sufficiently egregious to warrant skipping one or more. In the present case, there was no evidence presented by the Company to support skipping a written warning and no evidence that other violations of a similar nature had skipped a written warning. Nor was there any evidence produced by the Company that a similar infraction had received a day suspension. Given these facts, I find Roy should have been given a written warning for this incident.

**AWARD**

The suspension given to Daniel Roy was not for just cause. He shall be given a letter of warning and made whole for the day of suspension.

January 24, 2002
Scituate, MA

Bruce Fraser
Arbitrator

H



. In the Matter of the Arbitration between:

---

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 2322

      -and-

VERIZON NEW ENGLAND

---

Re: Case No. AAA 11 E 300 00368 2 (Giannotti Suspension)


Having been designated as the Arbitrator in accordance with the provisions of the parties' collective bargaining agreement, and having heard and considered the evidence presented, I award as follows:

> The one-day suspension to Dennis Giannotti was not for just cause. It shall be reduced to a Letter of Warning and the grievant shall be made whole for all lost wages and benefits.


May 4, 2002
Scituate, Massachusetts

Bruce Fraser
Arbitrator

| IBEW, LOCAL 2322 | ARBITRATION DECISION & AWARD |
|---|---|
| -and- | AAA 11 E 300 00368 2 |
| VERIZON NEW ENGLAND | May 4, 2002 |

A hearing was held on April 1, 2002 in Boston, Massachusetts. The Union was represented by Betsy Ehrenberg, Esquire, and the Company was represented by Donald Schroeder, Esquire. Post-hearing briefs were received by the arbitrator on April 17, 2002.

**THE ISSUE**

At the hearing the parties agreed upon the following issue:

Was the one day suspension of Dennis Giannottti for just cause?

If not, what shall the remedy be?

**THE FACTS**

In December 2000 Dennis Giannotti, a 21 year veteran, was working as a Splice Service Technician at the Brockton garage. On December 20, he was driving his truck in Brockton when he turned a corner and struck a parked car, breaking off the driver-side mirror of the car. After exchanging the relevant information with the driver, Giannotti telephoned his supervisor Michael Reis and reported the incident.

Reis testified that he talked with Giannotti that day after the accident in a coffee shop and telephoned the owner of the car which was involved. Based on this information and Giannotti's safety record, the grievant was given a one-day suspension for being involved in a preventable motor vehicle accident. The grievant's safety record consists of a Letter of Warning issued in October 1999 for a preventable accident involving his truck striking an overhead awning at a McDonald's drive-through. Reis stated that the Giannotti was not referred to the Zone Control

Course, a driving safety refresher course, although it was noted on the 1999 Accident investigation Report to be scheduled for him.

Reis further testified that in imposing discipline he considers each case on its own merits, weighing factors such as the length of service of the employee, severity of the incident, employee's prior work history, and whether the accident was preventable. He stated that backing incidents often result in an immediate suspension and he acknowledged that he has omitted the verbal warning level of discipline on occasion.

The union entered into evidence a series of disciplines imposed by Reis for preventable motor vehicle accidents and an indication of their final disposition. Of relevance here are the following:

1. Roy (1998) Contact Memo for a preventable motor vehicle accident, later removed;
2. Kennedy (1999) Letter of Warning for 2nd preventable motor vehicle accident within 11 months, later reduced to a Contact Memo;
3. Johnson (1999) Letter of Warning for a preventable motor vehicle accident when making a turn, later reduced to a Contact Memo;
4. Toto (2000) Letter of Warning for a preventable motor vehicle accident when backing up his vehicle, later reduced to a Letter of Warning;
5. McDermott (1999) One-day Suspension for two preventable motor vehicle accidents within two months, later reduced to a Letter of Warning.

## CONTENTIONS OF THE COMPANY

The Company's argues that it's progressive discipline policy is not a lock-step process but rather each incident is considered on its own merits, taking into consideration a variety of factors including the severity of the accident, the seniority of the employee, mitigating circumstances, and the employee's accident history. It notes that the Company has the undisputed right to enforce reasonable safety rules, and points out that Reis has suspended employees for multiple in-

3

fractions of the same offense. Furthermore, it maintains that arbitrators have routinely sustained disciplinary action where employees have engaged in preventable accidents.

In this case, the Company points out that the grievant had been involved in four prior accidents with Company vehicles (January 1994, February 1995, April 1995, and October 1999) and, given that his prior accident for which he had received a Letter of Warning had occurred only 14 months prior, it contends that there was just cause to impose the one-day suspension for the accident on December 20, 2000.

In regard to the Union's evidence of settlements reached between the Company and Union in other cases, where the employees had been disciplined for a preventable motor vehicle accident, the Company contends that the specific details of these cases are not known. Moreover, there is ample basis in the present case to warrant the one-day suspension.

## CONTENTIONS OF THE UNION

The Union contends that there are three grounds to sustain the grievance. The first is the Company's lack of thorough investigation of the accident and its reliance on the statements of the owner of the car which was struck as to the severity of the damage suffered. The extent of damage was not known to the Company when it issued the discipline nor was it aware of any factors which could either aggravate or mitigate the accident situation.

Second, the consequences here are minor: a clipped side mirror; no other physical damage; no personal injury. These facts, it argues, should militate against the loss of a day's pay, particularly when the grievant took the accident seriously, both when it occurred and later at the hearing. Relevant here is the fact that after his earlier accident in October 1999, the Company did not

schedule him for a Defensive Driving Class, as it indicated it would on the 1999 Accident Investigation Report, Item 13, or the Zone Refresher Course.

Third, the penalty of a one day suspension is not consistent with other discipline imposed by Reis for like and more serious accidents. As can be seen from the above citation of five incidents, the one-day Suspension is disproportionate to the incident and inconsistent with the Company's policy for motor vehicle accidents.

## DISCUSSION

The facts of this case are clear: the grievant drove his motor vehicle in such a way that he clipped off the side mirror of a car parked on the street. The only question here is the quantum of discipline.

I am in agreement with the Company that progressive discipline does not always proceed in a lock-step fashion. Factors such as seniority, accident history, prior discipline, severity of damage and/or injury, and the circumstances surrounding the accident all may play a role. In the present case, we have a 21 year veteran who had had four prior accidents but only one of these (October 1999) was deemed by management to be of sufficient seriousness to warrant any discipline: a Letter of Warning. This is his sole disciplinary record in evidence. In the accident of December 20, 2002, there was minor damage to the parked car, no personal injury, and we do not know of the circumstances, since the Company failed to pursue this issue. Were this the only evidence, I would not second-guess management and would uphold the one-day suspension.

However, there is additional evidence. There is a series of disciplines (cited above) in which the damage done was arguably greater, the seniority of the employee far less, or the accident history more serious, yet the discipline ultimately meted out for these infractions was a Letter or

5

Warning, a Contact Memo, or nothing. Moreover, there was no counter evidence produced to show the cases similar to the present one have received a one-day suspension.

I find that given the circumstances of the December 20, 2000 accident, the work history of the grievant including his disciplinary record, and the history of the Company's disciplinary actions involving motor vehicle accidents as reflected in the evidence before me, a one-day suspension is indeed disproportionate. It shall be reduced to a Letter of Warning.

**AWARD**

The one-day suspension to Dennis Giannotti was not for just cause. It shall be reduced to a Letter of Warning and the grievant shall be made whole for all lost wages and benefits.

May 4, 2002
Scituate, Massachusetts

Bruce Fraser
Arbitrator



In the Matter of the Arbitration between:

| |
|---|
| IBEW, Local 2322 |
| -and- |
| Bell Atlantic |

Re: AAA Case No. 11 E 300 00799-99

Having been designated as the Arbitrator in accordance with the provisions of the parties' collective bargaining agreement, and having heard and considered the evidence presented, I award as follows:

The 20-day suspension of Donald Campbell was not for just cause. He shall be made whole for all lost wages and benefits.

October 12, 1999

Bruce Fraser
Arbitrator

| IBEW, LOCAL 2322 | ARBITRATION OPINION & AWARD |
|---|---|
| -and- | AAA No. 11 E 300 00799 99 |
| BELL ATLANTIC | October 12, 1999 |

A hearing was held on August 13, 1999 in Boston, Massachusetts. The Union was represented by Harold Lichten, Esq., and the Company was represented by John Corrigan, Esq. Post-Hearing briefs were received by the arbitrator on September 19, 1999.

## THE ISSUE

The parties agreed upon the following issue:

> Was there just cause for the 20-day suspension arising from the failure of Donald Campbell to cooperate with security investigators and at later times?

> If not what shall be the remedy?

## THE FACTS

On January 31 1999, Security Manager William Roe, while performing surveillance for the Company, observed the truck of the grievant, Daniel Campbell, in the Bent Street Central Office parking lot from 12:24 p.m. until at least 1:19 p.m. From the relevant work records, the Company concluded that the job he was assigned to should not have taken nearly that long and on February 9, 1999 called him to an investigatory meeting.

Campbell along with Business Agent Ed Hastings and a Union steward, met with Roe and Ellen Markham of Security. The parties agree that Roe, after showing Campbell a copy of his time sheet for January 31, 1999 and the Bell Atlantic Code of Con-

duct, asked Campbell if he were willing to discuss his activities on January 31, 1999.

Campbell replied in the affirmative. After a few general questions about the jobs and his

activities on that date, which Campbell answered to the best of his recollection, Hast-

ings inquired about the scope of the investigation. Roe stated that they wanted to know

about his activities on January 31, and would not be more specific. Hastings, who testi-

fied at the arbitration hearing that he thought the investigatory hearing was to discuss

the issue of sabotage, a criminal offense, thereupon called a recess, and consulted

with the Union's attorneys. When he returned he informed Roe that unless he would be

specific about the allegations against Campbell, he would instruct Campbell to not an-

swer any more questions. When Roe again refused to elaborate, Campbell was in-

structed to remain silent. He did so, and Campbell's manager, Dennis Law, subse-

quently suspended him indefinitely, pending investigation.

On the same day, another employee, Joseph Fitzgerald, was also questioned by

Roe about his activities on January 31, 1999. Hastings, who was present, instructed

Fitzgerald not to answer any questions. No questions were asked by Roe. Ultimately,

the Company determined that Fitzgerald spent too long on one job that day and im-

posed a 6-hour suspension for his "refusing to cooperate in an official investigation and

for your overall poor job performance in Sunday January 31, 1999."

The Company, not aware of any reason for why Campbell should have been at the

Bent Street Central Office around noon on January 31, 1999, terminated him on Febru-

ary 23, 1999 specifying that

Your termination is the result of your violation of the Bell Atlantic Code of Business Conduct, specifically falsification of TIME REPORTS.

On February 26,1999 at Step 1 grievance hearing was held where Law presented the Company position to the Union and asked for its account of the day in question. When the Union refused to provide any explanation, the grievance was denied.

On March 5, 1999 a Step 2 grievance hearing was held. At this time, the Union provided a full accounting of Campbell's activities on January 31, 1999 and, after further Company investigation, the termination was reduced to a 20-day suspension and the grievant was returned to work on March 9, 1999. An undated Return to Work letter, which reads in part as follows, was sent to the grievant:

> A meeting was held on March 22, 1999, at 75 Smith Pl. Cambridge, Ma. to discuss the circumstances of your 20-day suspension…
>
> On February 9, 1999 (sic) you were suspended for 20 days as a result of serious violations of the Bell Atlantic Code of Business Conduct regarding your work activities on Sunday January 31, 1999. These violations included your subsequent **refusal to cooperate in a company investigation of work related matters and misuse of company work time while on an overtime assignment** [my emphasis].

(The suspension didn't occur until March 5, 1999 but this error isn't critical to the case.)

At the arbitration hearing on August 13, 1999, the parties agreed that the charge of "misuse of company work time" deserved only a letter of warning. Thus the 20-day suspension meted out was for the refusal to cooperate in a company investigation of work-related matters.

The Company's Code of Business Conduct, unilaterally promulgated, states in part as follows;

**Investigations**

When misconduct is suspected, the company will conduct an investigation to determine whether a violation of the law or company standard has occurred.

We will fully cooperate in any company investigations of misconduct or work-related matters. Failure to do so constitutes a violation of company standards..

...

## CONTENTIONS OF THE COMPANY

The Company contends that it had just cause to impose a 20-day suspension on the grievant. It maintains that it has the right to require cooperation in a work-related investigation and the Union has no right to interfere. When Campbell was reminded of his obligation to cooperate and shown the Code of Conduct, and then refused to answer questions either general or specific in nature, the Company was justified in relying solely on the facts that it had amassed to make a decision. Based on these, it was justified in suspending him.

The Company asserts that it had investigated as well as it could, knew only one side of the story, whereas the Union was fully aware of the details as early as February 16, 1999, yet withheld this information until March 5, 1999. It was only then, when the Company heard this explanation, that it was able to determine that Campbell's infraction was not as serious as previously believed. The 20 days was arrived at as the amount of time the Union withheld the full explanation from the Company. It argues that to reinstate him without the 20-day suspension would have given him paid time-off brought about as a result of his lack of cooperation.

6

The Company continues that pursuant to <u>NLRB v. Weingarten</u>, 95S.Ct. 959 (1975) it had the absolute right to interview Campbell as long as he was afforded with Union representation, which he was. It emphasizes that this decision provides that the Union is present to assist the employee, but "the employer is free to insist on hearing the employee's own account of the matter under investigation." It points as well to an NLRB decision where it was found that the employer can seek to compel employee cooperation in answering questions as long as the matter is still in the investigatory stage and no final disciplinary action has been taken. It maintains that even if Campbell's refusal to cooperate was based on his Union's advice, the imposition of discipline for failure to cooperate was justified. Thus, the Company was within its rights to discipline the grievant for failing to cooperate at the investigatory interview and thereafter.

Finally, the Company argues that the Fitzgerald case is easily distinguishable from the Campbell matter. Although Fitzgerald, like Campbell, refused to cooperate and answer questions, the Company was able to determine independently that Fitzgerald's actions did not warrant significant disciplinary action. With Campbell, until the Union provided the full account of his January 31, 1999 activities on March 9, 1999, the Company was unable to reach a similar determination. Whereas Campbell's lack of cooperation caused delay in the Company obtaining all the relevant facts, this was not the case with Fitzgerald. For this reason the Company imposed only a 6-hour suspension on Fitzgerald for his failure to cooperate.

**CONTENTIONS OF THE UNION**

The Union contends that there was not just cause to impose a 20-day suspension on the grievant for his failure to cooperate at an investigatory hearing and thereafter. It asserts that when a supervisor calls in employees and questions them about their activities, the Union instructs them to cooperate fully. In the present case, the questioning was being conducted by security and the supervisor, Law, was excluded.

The problem, according to the Union, was that the grievant did not have any idea what the focus of the investigation was, what the evidence was, or who else was involved. In such cases, the Union, on advice of its attorneys, will instruct the employee not to answer questions unless and until the Company's allegations are made know to the Union. This occurred in the present case when security persisted in asking questions without Campbell being aware of what he was possibly accused of. The Union points out that within two weeks of the February 9, 1999 security investigation, a meeting occurred between Union and Management at which the facts of Campbell's and other employees' cases were presented.

The Union maintains that the Code of Conduct uses the terms "investigation" and "cooperation" but no explanation is provided on how these terms are to be applied. In the present case, the Union finds it to be unreasonable to subject the grievant to continued questioning about activities that happened nine days before about which he could not remember, particularly when he was not informed of the reasons why he was being questioned.

The Union po nts out that contrary to other collective bargaining agreements, there is nothing in the parties' Agreement which requires an employee to cooperate in a company security investigation. It argues that in the absence of a specific contract pro-vision, arbitrators have applied a standard of reasonableness in accordance with the principles of industrial due process. The Union asserts that under the concept of in-dustrial due process, an employee cannot be disciplined simply for failing to cooperate in an investigation where the only purpose is to obtain self-incriminating evidence.

The Union contends that if, on February 9,1999, Campbell had been brought in and told that he had been observed in a Company Central Office for 45 minutes on January 31, 1999, and questioned about his reasons for being there, the Union would have in-structed him to answer. But security was not so forthcoming, and refused to divulge the reasons for the questions or even if Campbell was suspected of any wrongdoing. Under these circumstances, where a fair and reasonable investigation was not present, the Union instructed him not to answer. To the extent that this instruction was improper, the Union argues, the employee should not be penalized but only warned about similar fu-ture conduct.

The Union cont nues that this is the first time the Company had suspended an em-ployee solely for failing to cooperate in a security investigation and argues that neither the Union nor Campbell were on notice that discipline could be imposed for failing to cooperate. It points out that Fitzgerald did the same thing as Campbell--refuse to an-swer questions presented to him by security where the allegation were not spelled out-- and he was given a 6-hour suspension whereas Campbell was given 20 days. Moreo-

ver, the 20-day suspension was given both for misuse of Company time and failure to cooperate. With the reduction of the first charge to a letter of warning, the Union argues that it is hardly appropriate to retain the 20-day suspension for the failure to cooperate issue.

## DISCUSSION

The issue in this case is essentially the following: Can employees who are brought in for a security investigation refuse to answer specific questions about a work-related matter if they ask about their status in the investigation and are refused an explanation? I find in the affirmative.

The Company's Code of Conduct provides that employees will fully cooperate in investigations. This code mirrors arbitral decisions which have found that employees are required to assist the employer in an investigation by cooperating and by answering questions. However, a balance must be struck. An investigatory interview is not an adversarial encounter but an opportunity for factfinding.

Whereas the Company has the right to question employees about a work-related matter, and the right to expect cooperation, it has the obligation to provide employees with an explanation of why they are there. Employees have the right to know their presumed status in the investigation: witness to an event or participant in an event? Are they possibly subject to charges arising from a violation of the Company policy, the contract, or are they being questioned in connection with a civil or criminal offense? Not to provide the employee with this information prior to detailed questioning is unfair, un-

10

reasonable, and contrary to the cooperative spirit inherent in this collective bargaining agreement.

In the present case, Campbell was called in, began by cooperating with security, but had difficulty remembers the details of the day in question. When Business Agent Hastings, on behalf of the grievant, asked for a specification of the Company's focus in this investigation, the Company refused that information. At that point, the grievant did not know if he was a the subject in the investigation or only ancillary witness, and did not know if he was subject to charges of violating Company rules, policy or the law. Therefore, he refused to answer further questions without more information about the focus of the investigation. Had the Company indicated that they wanted to know why he was at the Bent Street Central Office on that day and what transpired during the 45 minutes he was there, he would have been obliged to answer security. But security told him nothing. Thus under these circumstances, I find he was justified in refusing to con-tinue answering questions.

Given the finding that he did nothing wrong on January 31, 1999 when he refused to answer further questions, I find no basis for the 20-day suspension. The grievance is sustained.

**AWARD**

The 20-day suspension of Donald Campbell was not for just cause. He shall be made whole for all lost wages and benefits.

October 12, 1999
Scituate, Massachusetts

Bruce Fraser
Arbitrator

J

### BRUCE FRASER
#### ARBITRATOR / MEDIATOR
**730 CUSHING HIGHWAY**
**SCITUATE, MASSACHUSETTS 02066**
Phone (781) 545-3598    Fax (781) 545-5127
bfraser@bu.edu

August 16, 2004

Ms. Claire Connelly
American Arbitration Association
133 Federal Street, 11th Floor
Boston, MA 02110-1703

In response your letter of July 1, 2004 and our joint telephone call, I clarify my award for Case
11 E 300 02702 03 (21-03) as follows:

> The one day suspension give to Thomas Ouellette was not for just cause. He shall
> be made whole for all lost wages and benefits arising from this suspension and the
> discipline shall be removed from his file.

> The day of the funeral shall be treated as day of leave without pay.

Sincerely,

Bruce Fraser
Arbitrator



RECEIVED
AUG 2 0 2004
AMERICAN ARBITRATION ASSOCIATION
BOSTON, MA

K



✗ 2ND Step - JIM Ferrell

**VERIZON – NEW ENGLAND**

### STEP 3 GRIEVANCE HEARING

DATE: 4-4-05                    LOCAL: 2322

GRIEVANCE #: 176-04           DIRECTOR: Glynn

ACT OR OCCURRENCE: One day Susp

GRIEVANT(S): Peter Larson      NCSD: 6-14-82

JOB TITLE: SST                 LOCATION: Plymouth

CONTRACT ARTICLE(S) CITED: P-10

REASON FOR DISCIPLINE: Conduct unbecoming VZ EE

REMEDY REQUESTED: C+D make whole

DATE INITIAL GRIEVANCE FILED:

SUPERVISOR INVOLVED: Mike ~~████~~ Ries

### STATEMENT OF GRIEVANCE

Management

4-26-04 given a work assignment upon which he began berating and belittling his supervisor.

He was asked to respond to a drape in the field to put up a track closure because it was raining. He was given a drape.

He was F this and F that. 2 foreman witness the behavior.

We then sent Jim Brogan out to do the job without incident.

Grievance # _____176-04_____          'Page _____2_____

**VERIZON – NEW ENGLAND**

**STEP 3 GRIEVANCE HEARING**

**STATEMENT OF GRIEVANCE**

Union

Again* offered to rescind the suspension but not pay him. This grievant just thinks F is an adjective. They were both treating eachoth the same.

Denied

* This was also offered at step 2 of the grievance

## VERIZON – NEW ENGLAND

### STEP 3 GRIEVANCE HEARING

DATE: 3/22/05          LOCAL: 2322

GRIEVANCE #: 527-03     DIRECTOR: Glynn

ACT OR OCCURRENCE: 3 day Suspension

GRIEVANT(S): Phil De Silva     NCSD: 1-16-95

JOB TITLE: SST     LOCATION: FR

CONTRACT ARTICLE (S) CITED:

REASON FOR DISCIPLINE: Failure to report for a forced

REMEDY REQUESTED: CTD make whole

DATE INITIAL GRIEVANCE FILED:

SUPERVISOR INVOLVED: Jim Cerullo

#### STATEMENT OF GRIEVANCE

Management.

On Sat 9/6/03 force. He
had SS toward his 12. He
was required to work at least
5 on Sat and he failed to
report.
He had personal notice. posted
paged and face to face.
He said he needed to set up
for a B-day party for his
girlfriends son. He was told
the excuse was not enough and
that had to report.

Grievance # 527-03    'Page 2

**VERIZON – NEW ENGLAND**

**STEP 3 GRIEVANCE HEARING**

**STATEMENT OF GRIEVANCE**

Union:

Phil notified Management a couple of days in advance that he had to be there for his girlfriend's daughter.

Rob Dakin was let out for a birthday party for his great aunt.

He was suspended 3 days based on prior discipline. The prior discipline was not related.

Management:

Robe was let out for a family member. He produced a ticket for the event.

Union:

There were 2 other garages involved with the job action that gave rise to the 1 day suspension and no other garage has used it as previous discipline.

Grievance # _____527-03_____                    'Page ___2___

## VERIZON – NEW ENGLAND

## STEP 3 GRIEVANCE HEARING

## STATEMENT OF GRIEVANCE

Union

offered to take a letter
of warning but keep one days pay and
The company position let
people with less OT off that
day

In full and final
settlement the Union accepts a
one day suspension.

This offer by the Union
to change the three day
suspension to a letter of
warning and 2 days pay back
is rejected.

M

RECYCLED





Labor Relations - New England

185 Franklin Street, Floor 11
Boston, MA 02110-1585

February 2, 2004

Mr. Richard R. Cappiello, Business Manager
Local 2322, IBEW
106 West Grove Street
Middleboro, MA 02346

Dear Mr. Cappiello:

This will confirm our agreement of February 2, 2004 concerning grievance numbers 508-01, 459-03, 32-04 and arbitration case # 1130-2832-02 all involving discipline of Splice-Service Technician Manuel Carrico. In full and final settlement of these grievances and arbitration case and all claims and matters whatsoever by or against the Company or the Union:

1. The grievances and arbitration case are hereby settled. The Union will withdraw the arbitration case and neither regrieve nor refile these cases for arbitration.

2. With regard to these matters, the discipline record in Mr. Carrico's personnel file shall consist of a letter of warning, a one day suspension and a two day suspension all for failure to show up for an overtime assignment.

3. Mr. Carrico will not be paid for the two day suspension which gave rise to the above mentioned arbitration case, however, the record will reflect a letter of warning for the incident. The three day suspension associated with grievance # 459-03 will be adjusted to a one day and the five day suspension associated with grievance # 32-04 will be adjusted to two days.

4. As a result of this settlement Mr. Carrico will receive five days pay.

5. Settlement of this case, including the original discipline, shall not constitute precedent for any other case or matter.

Agreed for the Union

Business Manager, Local 2322

Agreed for the Company

Verizon Labor Relations